# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 2:10-CR-109 |
| | ) | (2:14-CV-11) |
| ALEX GUERRERO | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on the Motion Under 28 U.S.C. Section 2255 To Vacate, Set Aside, Or Correct Sentence By a Person in Federal Custody, filed by Alex Guerrero on January 10, 201 (DE #1108). For the reasons set forth below, the section 2255 motion is **DENIED**. The Clerk is **ORDERED** to **DISMISS** this case **WITH PREJUDICE**. The Clerk is **ORDERED** to distribute a copy of this order to Alex Guerrero, #11905-027, Allenwood FCI - 1000- Low, Federal Correctional Institution, Inmate Mail/Parcels, P.O. Box 1000, White Deer, PA 17887, or to such other more current address that may be on file for the Petitioner. Further, this Court declines to issue Defendant a certificate of appealability.


BACKGROUND

On November 16, 2011, a Third Superseding Indictment was filed

against Defendant, Alex Guerrero and twenty other defendants.[1] (DE #230). Guerrero was charged in Counts One, Two, Fourteen, and Fifteen of the 15-count Third Superseding Indictment. Count One charged Guerrero and others with conspiracy to participate in racketeering activity in violation of 18 U.S.C. § 1962. Count Two charged Guerrero and others with conspiracy to possess with intent to distribute and distribute cocaine and marijuana in violation of 21 U.S.C. § 846. Count Fourteen charged Guerrero with interference with commerce by threats or violence, in violation of 18 U.S.C. § 1951. Count Fifteen charged Guerrero with using and carrying a firearm during and in relation to crimes of violence and drug trafficking, in violation of Title 18 U.S.C. § 924(c)(1)(A).

On July 26, 2012, Guerrero entered into a plea agreement with the Government, and the agreement was filed with this Court. (DE #501). In it, Guerrero agreed to plead guilty to Count One, Two, Fourteen, and Fifteen of the Third Superseding Indictment. (*Id.*, ¶ 7). The Government and Guerrero also reached certain agreements that were not binding on the Court. (*Id.*, ¶ 8). Specifically, they agreed that if Defendant continued to accept responsibility for his criminal conduct, he should receive a two point, and if eligible, an additional one point reduction in his Guideline offense level. (*Id.*, ¶ 9(a)). They also agreed that the

---

[1] The case had a total of 23 defendants, but two plead guilty prior to the filing of the Third Superseding Indictment.

Government would recommend a sentence equal to the minimum of the applicable guideline range. (*Id.,* ¶ 8(b)). They further agreed that Defendant is responsible for 150 kilograms or more of a mixture and substance containing a detectable amount of cocaine; that the victim of Count 14 was physically restrained, that Defendant abused a position of public trust that significantly facilitated the commission or concealment of the offense, and that Defendant used body armor during the commission of the offense. (*Id.,* ¶ 8(c)-(f)). Lastly, they agreed that, considering the totality of the circumstances, "a just and appropriate sentence as to a term of imprisonment is a period of 228 months." (*Id.,* ¶ 9).

Further, Defendant agreed that his attorney had "done all that anyone could do to counsel and assist [him]," that he was offering his guilty plea "freely and voluntarily and of [his] own accord," that "no promises [had] been made to [him] other than those contained in [the] agreement," and that he had not been "threatened in any way by anyone to cause [him] to plead guilty in accordance with [the] agreement." (*Id.,* ¶¶ 15-16).

This Court held a change of plea hearing on August 2, 2012. (DE ##516, 1114). When asked whether he was "fully satisfied with the counsel, representation, and advice given to you in this case by Mr. Milner as your attorney?" Guerrero replied "yes, Your Honor." (DE #1114 at 8-9). After Guerrero read through paragraphs 7 through 14 of his plea agreement, the Court asked him whether he

read it previously, understood it, agreed with it, and was asking the Court to approve it. Guerrero answered yes to each of these questions. (*Id.* at 9-10). Guerrero acknowledged repeatedly that he agreed with the individual and collective terms of the plea agreement and confirmed that he wanted to plead guilty under the agreement. (*Id.* at 9-65).

The Court informed Guerrero of the maximum and minimum penalties for each of the four counts he was pleading guilty to. (*Id.* at 14-21). Guerrero indicated that he understood the possible sentences he could receive. (*Id.*).

The Court also confirmed that Guerrero understood that the Court would ultimately decide his sentence and that neither the Government's recommendations nor the Guidelines were binding. (*Id.* at 26-31). This included clear notification that the Government's recommendation that Guerrero be sentenced to a term of imprisonment of 228 months was not binding on the Court. (*Id.* at 30-31).

The following exchange occurred:

> Q: Finally, under subsection (g), you and the government are in agreement pursuant to Title 18, United States Code, Section 3553, which are factors that the Court has to consider, and with regards to cooperation that you're going to have in paragraphs 10 and 11, that a proper sentence in this case would be 228 months; is that correct?
>
> A: Yes, Your Honor.
>
> Q: Mr. Guerrero, do you understand that this is only a recommendation? Who makes the final decision?

4

```
A:    You do, Your Honor.

Q:    And you understand that I may agree with
      all of you.  I may not.  I may think your
      sentence should be higher or lower.  Do
      you understand that?

A:    Yes, Your Honor.

Q:    Are you in agreement with that?

A:    Yes, Your Honor.
```

(*Id.* at 30-31).

The Court asked Guerrero to explain why he was guilty of each
Count.  (*Id.* at 46).  He indicated that the crimes took place
between 2004 and 2006 in both Illinois and Indiana.  (*Id.* at 46-
47).  Guerrero was a Chicago police officer at the time and was
taking directions from Sisto Bernal, a member of the Latin Kings.
(*Id.* at 47).  More specifically, he "just took directions regarding
these robberies."  (*Id.* at 48).  He admitted he, along with his
police partner, "committed the robberies at his [Sisto Bernal's]
direction."  (*Id.* at 50).  He admitted to robbing drugs, money and
guns.  (*Id.*).  These were given to Sisto Bernal.  (*Id.*).  He
further admitted that these robberies were done in order to make
the efforts and the activities of the Latin Kings successful.  (*Id.*
at 53).

With regard to Count 14, Guerrero testified that "[i]t was a
robbery that my partner and I committed" in December of 2006.
(*Id.*).  He robbed James Walsh, also known as Jim Bob.  (*Id.* at 54).
He stated that "My partner and I, with our police uniforms, went

into his property." (*Id.*). They then took his possessions. He further admitted that he had a weapon and that he used the uniform and weapon in order to accomplish the robbery. (*Id.* at 54). He indicated that the stolen property was turned over to Sisto Bernal. (*Id.* at 55).

The Court also asked counsel for the Government to summarize the facts that they were prepared to prove at trial with regard to each count that Guerrero intended to plead guilty. (*Id.* at 57). The following summary was provided:

> As to Count One, the RICO conspiracy, if the government proceeded to trial, we would prove beyond a reasonable doubt that the Latin Kings, including its associates, constituted an enterprise as defined in the statute, a group of individuals associated in fact. The Latin Kings constituted an ongoing organization whose members function as a continuing unit for the common purpose of achieving the objectives of the enterprise. The enterprise was engaged in and its activities affected interstate commerce.
>
> From roughly 2004 to 2006, this defendant, together with his Chicago Police Department partner, Antonio Martinez, and Sisto Bernal, who was one of the leaders of the Latin Kings, and others knowingly and intentionally conspired to conduct and participate in the conduct of the affairs of the Latin Kings through a pattern of racketeering activity, here consisting of multiple acts of Hobbs Act robberies and drug trafficking.
>
> More specifically, during the course of the conspiracy, in the same time period, 2004-2006, this defendant, Mr. Guerrero, was employed as a Chicago Police Department officer on the south side of Chicago. He was assigned to a tactical unit. He would not wear a police uniform. He would wear civilian clothes or tactical gear and carry his

department issued gun, his badge and a
bulletproof vest and clothing that was marked
with the Chicago Police Department on it.
During this time period, his co-defendant,
Antonio Martinez, was his partner.

During the course of the conspiracy, this
defendant and his partner Martinez agreed to
commit and then did commit multiple Hobbs Act
robberies, sometimes referred to as drug rips,
on the street on behalf of Sisto Bernal, one
of the leaders of the Latin Kings. They
committed these robberies while on the clock
while working for the Chicago Police
Department during their duty shifts. They
also did it off duty. They wore their badges
and vests and department-issued firearms,
drove their unmarked Chicago Police Department
cars. Those robberies occurred both in
Chicago and the Northern District of Indiana.
In this district they were primarily in
Hammond and East Chicago.

During the course of these robberies,
this defendant and his partner pretended that
they were doing legitimate traffic stops on
duty and search warrants and searches on duty
and in their capacity as police officers, but
what they were really doing was looking for
drugs, guns and money to turn over to Sisto
Bernal and the Latin Kings back in Chicago.
These robberies include, but aren't limited
to, an event between 2004 and 2006 where this
defendant and his partner and Sisto Bernal and
another individual drove from Chicago to a
warehouse around Rockford, Illinois, that was
being used to store marijuana. There, this
defendant and his partner, they were in
tactical gear with their badges and firearms
marked as Chicago police officers. At Sisto
Bernal's direction, they broke into the
warehouse and stole a large amount of
marijuana. They turned it over to Bernal and
were paid approximately $2,000 each for this.

There was another event between 2004 and
2006 where Sisto Bernal directed this
defendant and his partner to make a traffic
stop on a female driver who was transporting
marijuana from Mexico up to Chicago. They
were in their Chicago Police Department car.
They had their badges on, their department-

issued firearms.  They did this traffic stop posing or pretending like they were doing a legitimate police traffic stop.  They released the female driver.  They held on to her minivan.  They tore it up and located between 90 and 100 pounds of marijuana, which they turned over to Sisto Bernal.

During the same time period, 2004 to 2006, Sisto Bernal directed this defendant and his partner to the residence of a drug trafficker in East Chicago, Indiana, in the Northern District of Indiana, obviously outside of their jurisdiction as Chicago police officers.  Again, under the guise of a legitimate police investigation, they posed as police officers.  They had their badges, their guns, marked as Chicago police officers.  And they took between $20,000 and $25,000 of drug money and turned it over to Sisto Bernal, and they were paid 3 to $4,000 each for this.

During all these events that I'm discussing today, there were never any arrests, no paperwork was ever turned in and no evidence was ever turned in to the Chicago Police Department.

There was another event between 2004 and 2006 in the City of Chicago where these two defendants were sent by Sisto Bernal.  They were sent by a man, Hiluterio Chaves, also known as Zeus or Tails.  He was a Latin King. They did another Hobbs Act robbery, this time, again, they were in Chicago uniforms -- strike that - - Chicago police tactical gear, wearing their badges, their guns, marked as police officers.  Again, they were under the guise of a legitimate police investigation.  This time they took a Latin King, Hiluterio Chavez, with them who posed as a police officer between the course of this.  And they stole between 20 and $40,000 in drug proceeds and turned it over to Sisto Bernal.  Each were paid 5 to $6,000 for this.

In October of 2005, there was another search they did, another drug rip they did here in Hammond, Indiana, not far from this courthouse, on Harrison Avenue.  There, during that search, they were sent by Sisto Bernal again, driving a police car, wearing badges and their department-issued guns and marked as

police officers. They took two Glock brand pistols that the resident legally owned and turned those over to Sisto Bernal. One of those guns turned up during a traffic stop in Nebraska a time later.

Then, in December 2006, there was another Hobbs Act robbery they conducted. That was at the residence of James Walsh, also known as Jim Bob. He was a leader of the Latin Dragons. He was one of the individuals killed at the Sopranos Restaurant in Griffith. That's also part of the indictment. There, again, they are driving a tactical car. They have badges. They have their vests. They have their department-issued guns. They went inside. They tied people up, and they stole firearms and some currency and some narcotics and turned it over to Sisto Bernal.

During all these events, he and his partner are armed. During all these events, they abused a position of power. During some of these events, people were physically restrained and tied up, and they wore their tactical ballistic vests during all these.

Turning to Count Two, the drug conspiracy, it is basically the same set of facts. They were stealing drugs, predominately cocaine, and turning it over to Sisto Bernal, the leader - - or one of the leaders of the Latin Kings. Through *Pinkerton* liability, they are liable for over 150 kilos or more of cocaine and a thousand kilos or more of marijuana, and these amounts were foreseeable to this defendant.

Turning to Count 14 and 15, it's the same set of facts that I mentioned earlier, discussing the robbery, the Hobbs Act robberies in December of 2006. There was a residence here in Hammond of James Walsh. It's the same facts that I discussed above. Again, they're in uniform with guns, badges, and they did one of these robberies at this residence and took the things that I mentioned before.

In Count 15 – well, strike that.

Moving backwards, as far as interstate commerce, they took narcotics that would have traveled in interstate commerce. They took drugs which would have traveled and affected

interstate commerce.

        Further than that, as I mentioned, Mr. Walsh was a leader of the Latin Dragons. That is an organization that operates both in Indiana and in Illinois, and they are an organization that affected interstate commerce.

        As far as the 924(c) count in Count 15, that's the same set of facts. He had a firearm, his department-issued firearm while doing that robbery.

        That's all.

(*Id.* at 57-63).

After a few follow up questions regarding the interstate commerce requirement, the following exchange occurred between the Court and Mr. Guerrero:

> Q: Mr. Guerrero, did you listen and pay close attention to the government's summary of facts constituting the crime charged?
> A: Yes, Your Honor.
> Q: Do you agree with the government's summary of facts?
> A: Yes, Your Honor.
> Q: Any part of it you disagree with?
> A: No, Your Honor.

(*Id.* at 64).

Following this exchange, counsel for both the Defendant and the Government stated that they were satisfied that the Defendant's plea was made knowingly and voluntarily and that it was supported by an independent basis in fact containing each of the essential elements of the offenses. (*Id.* at 64). Guerrero then pled guilty to each of the four counts of the Third Superseding Indictment. (*Id.* at 64-65). Based on Guerrero's responses at the change of plea hearing, this Court found:

> that the defendant, Alex Guerrero, is fully
> competent and capable of entering an informed
> plea and that his plea of guilty to the
> charges contained in Counts 1, 2, 14, and 15
> of the third superseding indictment is a
> knowing and voluntary plea supported by an
> independent basis in fact containing each of
> the essential elements of the offenses.

(*Id.* at 65).

On January 11, 2013, the Court sentenced Guerrero. (DE #739). There were no objections to the Guideline calculation set forth in the Presentence Report (*see* DE #700). This Court sentenced Guerrero to a total term of imprisonment of 228 months. (DE #739). This consisted of 168 months for each of Counts 1, 2 and 14, and 60 months for Count 15, to be served consecutively. (*Id.*). This is the length of imprisonment that the parties agreed was a just and appropriate sentence in their plea agreement. (DE #501 at 5). Judgment was entered on January 15, 2013. (DE #743). Guerrero did not file a notice of appeal.

Guerrero filed the instant motion under section 2255 on January 10, 2014, setting forth several arguments: (1) "Denial of effective Assistance of counsel"; (2)"Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea"; (3) "Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant"; (4) "My constitutional and civil rights were violated." (DE #1108). The Government filed a

response to the instant motion on March 31, 2014 (DE # 1122). Thereafter, Guerrero obtained counsel and counsel filed a reply on his behalf on July 28, 2014. (DE ## 1134, 1144). Therefore, this motion is fully briefed and ripe for adjudication.

## DISCUSSION

Habeas corpus relief under 28 U.S.C. section 2255 is reserved for "extraordinary situations." *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996). In order to proceed on a habeas corpus motion pursuant to 28 U.S.C. section 2255, a federal prisoner must show that the district court sentenced him in violation of the Constitution or laws of the United States, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. *Id.*

A section 2255 motion is neither a substitute for nor recapitulation of a direct appeal. *Id.; Belford v. United States*, 975 F.2d 310, 313 (7th Cir. 1992), *overruled on other grounds by Castellanos v. United States*, 26 F.3d 717 (7th Cir. 1994). As a result:

> [T]here are three types of issues that a section 2255 motion cannot raise: (1) issues that were raised on direct appeal, absent a showing of changed circumstances; (2) nonconstitutional issues that could have been but were not raised on direct appeal; and (3) constitutional issues that were not raised on direct appeal, unless the section 2255 petitioner demonstrates cause for the procedural default as well as actual prejudice from the failure to appeal.

*Belford*, 975 F.2d at 313.  Additionally, aside from demonstrating "cause" and "prejudice" from the failure to raise constitutional errors on direct appeal, a section 2255 petitioner may alternatively pursue such errors after demonstrating that the district court's refusal to consider the claims would lead to a fundamental miscarriage of justice.  *McCleese v. United States*, 75 F.3d 1174, 1177 (7th Cir. 1996).

In assessing Defendant's motion, the Court is mindful of the well-settled principle that, when interpreting a pro se petitioner's complaint or section 2255 motion, district courts have a "special responsibility" to construe such pleadings liberally. *Donald v. Cook County Sheriff's Dep't*, 95 F.3d 548, 555 (7th Cir. 1996); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (a "pro se complaint, 'however inartfully pleaded' must be held to 'less stringent standards than formal pleadings drafted by lawyers'") (quoting *Haines v. Kerner*, 404 U.S. 519 (1972)); *Brown v. Roe*, 279 F.3d 742, 746 (9th Cir. 2002) ("pro se habeas petitioners are to be afforded 'the benefit of any doubt'") (quoting *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.1 (9th Cir. 1985)).  In other words:

> The mandated liberal construction afforded to pro se pleadings "means that if the court can reasonably read the pleadings to state a valid claim on which the [petitioner] could prevail, it should do so despite the [petitioner's] failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements."

*Barnett v. Hargett*, 174 F.3d 1128, 1133 (10th Cir. 1999) (habeas petition from state court conviction) (alterations in original) (quoting *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)). On the other hand, "a district court should not 'assume the role of advocate for the pro se litigant' and may 'not rewrite a petition to include claims that were never presented.'" *Id.* Here, while Guerrero did have counsel at the time his reply was filed, the petition was filed *pro se;* therefore, the Court has assessed Guerrero's claims with these guidelines in mind.

<u>Guerrero's Claims are Without Merit</u>

Claims of ineffective assistance of counsel are governed by the 2-pronged test set forth in *Strickland v. Washington,* 466 U.S. 668 (1984). To prevail on an ineffective assistance of counsel claim, the Defendant must first show the specific acts or omissions of his attorney "fell below an objective standard of reasonableness" and were "outside the wide range of professionally competent assistance." *Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993) (quoting *Strickland*, 466 U.S. at 688, 690); *see also Hardamon v. United States*, 319 F.3d 943, 948 (7th Cir. 2003); *Anderson v. Sternes*, 243 F.3d 1049, 1057 (7th Cir. 2001). The second *Strickland* prong requires defendant to show prejudice, which entails showing by "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Regarding the

deficient-performance prong, great deference is given to counsel's performance, and the defendant has a heavy burden to overcome the strong presumption of effective performance. *Strickland*, 466 U.S. at 690; *Coleman v. United States*, 318 F.3d 754, 758 (7th Cir. 2003) (citation omitted). A defendant must establish specific acts or admissions that fell below professional norms. *Strickland*, 466 U.S. at 690. If one prong is not satisfied, it is unnecessary to reach the merits of the second prong. *Id.* at 697.

The Seventh Circuit has held that "[o]nly those habeas petitioners who can prove under *Strickland* that they have been denied a fair trial by the gross incompetence of their attorneys will be granted the writ." *Canaan v. McBride*, 395 F.3d 376, 385-86 (7th Cir. 2005). Additionally, trial counsel "is entitled to a 'strong presumption' that his performance fell 'within the range of reasonable professional assistance' and will not be judged with the benefit of hindsight.'" *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007) (citing *Strickland*, 466 U.S. at 689).

Guerrero's claim of ineffective assistance of counsel is difficult to understand. He states that:

> My attorney stated to me after reviewing my case that I had committed no crime, my only connection to this case was through my Chicago Illinois police patrol partner Antonio Martinez who had a connection with the Latin King street gang. At no time did Antonio Martinez alert me to any illegal activities. My attorney led me to believe that after investigating this case I had nothing to worry about that I would be cleared.

(DE #1108 at 5). Although it is not entirely clear how he believes his counsel was ineffective, what is clear is that Guerrero directly contradicted this claim at his change of plea hearing. He repeatedly admitted his guilt, providing many details, as noted above. "Because of the great weight we place on these in-court statements, we credit them over [defendant's] later claims." *United States v. Martinez*, 169 F.3d 1049, 1054 (7th Cir. 1999). The Court will not allow Guerrero to rewrite history in order to undercut the provisions to which he willingly agreed. *Id.* (citing *United States v. Byrd*, 669 F. Supp. 861 (N.D. Ill. 1987)). *See also United States v. Chavers*, 515 F.3d 722, 725 (7th Cir. 2008) (in the context of a defendant's attempt to withdraw his guilty plea, subsequent "bare protestations of innocence" that contradict his sworn testimony made during the plea hearing are insufficient to do so); *United States v. Pike*, 211 F.3d 385, 389 (7th Cir. 2000) (representations made by the defendant during a change of plea hearing are "entitled to a presumption of verity.").[2] As such, Guerrero's claim that his counsel was ineffective must fail.

---

[2] Furthermore, "[w]hen a district court conducts a Rule 11 colloquy, it is not putting on a show for the defendant, the public, or anybody else. The purpose of a Rule 11 colloquy is to expose coercion or mistake, and the district judge must be able to rely on the defendant's sworn testimony at that hearing. Because the court takes a criminal defendant's rights at a change-of-plea hearing very seriously, it is reasonable to expect, and demand, that the criminal defendant do so as well. For that reason, a defendant is normally bound by the representations he makes to a court during the colloquy." *Hutchings v. United States*, 618 F.3d 693, 699 (7th Cir. 2010) (internal quotation marks and citations omitted).

Next, Guerrero argues that his "[c]onviction [was] obtained by plea of guilty which was unlawfully induced or not made voluntarily or with understanding of the nature of the charge and the consequences of the plea." (DE #1108 at 4). He explains as follows:

> I plead guilty because my attorney told me that there was over whelming [sic] evidence against me including, a gun, which was the firearm that I carry as a part of my duty as a Police Officer not to use as a part of any illegal activities, alleged phone conversations that led to Mexico that the government claimed were illegal activities. These phone calls were my wife's relatives whom she call [sic] periodically to check [on] their welfare. I had no knowledge of these phone calls.

(*Id.*).

Again, Guerrero's claim that his police issued firearm was not used in any illegal activity is directly contrary to his testimony at his change of plea hearing. He has not presented any reason for this Court to credit his current version of the facts over his prior sworn testimony. At the change of plea hearing, this Court, in agreement with counsel for the Defendant and the Government, found that Guerrero's plea of guilty was made knowingly and voluntarily. His current statements to the contrary are unpersuasive. As a result, this claim also fails.

Guerrero also argues that his "[c]onviction [was] obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant." (DE #1108 at 4). He provides only the following in support of this claim:

> I was told by my attorney that the prosecution
> delayed giving my attorney information that
> would [have] proven my innocence and or was
> favorable to my case. Please refer to my PCR.
> Please see attachment.

(*Id.*).

It is not clear what portion of the PCR (presumably the Pre-sentence Investigation Report) he thinks supports this claim. The attachment he referenced is simply the sentencing memorandum filed by his counsel. (DE # 734). This memorandum describes Guerrero as a "follower" but in no way denies that Guerrero was knowingly involved in the crimes to which he pled guilty. To date, no evidence has been produced whatsoever that would prove Guerrero's innocence. Even now, Guerrero does not tell the Court what evidence was allegedly produced late, or how that evidence allegedly would have proven his innocence. Vague assertions are not enough. *Oliver v. United States*, 961 F.2d 1339, 1343 n.5 (7th Cir. 1992)(noting that, if the allegations of a section 2255 motion are vague or conclusory, the motion may be denied without a hearing). This claim fails for vagueness.

Lastly, Guerrero argues that his "constitutional and civil rights were violated." He further explains as follows:

> Before I could get to trial, I was accused in
> the eye of the media who was bias and
> judgmental against me for being a Chicago
> Police Officer who are held to a higher
> standard. At the time of my court appearance
> I was already judged guilty, my name was
> slandered, my association with Antonio
> Martinez made me look guilty. My police union
> they ask me to sign papers that I thought were

> to help me receive representation they turned
> out to be dismissal papers.  I was told that I
> was no longer a part of them.  I have fellow
> officers in the Chicago Police Department that
> want to come forward but could not for fear of
> losing their jobs.

(DE #1108 at 5).  First off, Guerrero's alleged wrongful termination by the Chicago Police Department is not a basis for relief under 28 U.S.C. section 2255.  And, even if his assertion that the public viewed him as guilty before trial is true, that too provides no basis for relief under section 2255.  Guerrero is not arguing that any jury was unfairly biased against him – just that public opinion was biased against him.  Indeed, this case never proceeded to a jury trial.  As a result, this claim does not include any facts which would support his claim that his constitutional and civil rights were violated.

While this resolves each of Guerrero's claims, one additional matter must be addressed.  It was noted earlier that Guerrero obtained counsel after his section 2255 motion was filed and that the reply brief was filed by counsel.  According to counsel:

> [Guerrero's] plea was primarily based upon
> speculation and careless recommendations from
> his trial counsel.  Most significant was the
> representation by counsel that Guerrero could
> possibly face life in prison if he lost at
> trial.

(DE #1144 at 2-3).  According to counsel, Guerrero's plea is the result of this "misinformation."  (*Id.* at 3).  What Guerrero's section 2255 motion actually says is *not* that his counsel told him

that he could face life in prison if he lost at trial, but the reason he did not file an appeal was that:

> I had no knowledge of what appeal to file. I was told by my attorney that if I filed an appeal I would receive a life sentence. I was told that there would be repercussions. My attorney would not turn over all of the documents to my case so that I can properly file for my appeals.

(DE # 1108 at 5). Putting aside counsel's confusion over the context in which Guerrero's trial counsel allegedly told him he would be facing a life sentence, that was indeed true: Guerrero was advised correctly by the Court that he was facing a possible life term of imprisonment on Counts One and Two (DE #1114 at 14 -16). And, even if Guerrero intended his explanation of why he did not raise certain issues previously to be a separate claim for relief – which is doubtful – the claim would fail. Guerrero did not allege that he directed his counsel to appeal and counsel refused. *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000). There are no allegations that his wishes were disregarded. In the absence of direction from a client to file an appeal, a lawyer remains obligated to consult with his client regarding "the advantages and disadvantages of taking an appeal" and make a "reasonable effort to discover the [client's] wishes." *Id.* at 478. Where an attorney consulted with the client regarding a possible appeal, the attorney can only be deemed professionally deficient if he then fails to follow the client's express instructions regarding the possible appeal. *Id.*

20

Here, Guerrero's section 2255 motion reveals that some discussion about whether an appeal was warranted took place between Guerrero and trial counsel, however imperfect they may have been, and fails to assert that Guerrero then directed that an appeal be filed. Guerrero has not demonstrated his counsel was ineffective by advising him not to appeal or failing to file an appeal on his behalf.

Certificate of Appealability

Pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings, a district court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate of appealability may issue only if the applicant "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a defendant must show that "reasonable jurists could debate whether (or, for that matter, agree that) the motion should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted).

For the reasons set forth above, Guerrero has not stated any grounds for relief under section 2255. The Court finds no basis for a determination that reasonable jurists would find this

decision debatable or incorrect or that the issues deserve encouragement to proceed further. Therefore, a certificate of appealability will not be issued.


CONCLUSION

For the aforementioned reasons, Defendant's section 2255 motion is **DENIED**. The Clerk is **ORDERED** to **DISMISS** this case **WITH PREJUDICE**. Further, this Court declines to issue Defendant a certificate of appealability. The Clerk is **ORDERED** to distribute a copy of this order to Alex Guerrero, #11905-027, Allenwood FCI – 1000- Low, Federal Correctional Institution, Inmate Mail/Parcels, P.O. Box 1000, White Deer, PA 17887, or to such other more current address that may be on file for the Petitioner.


**DATED: June 22, 2015**                    **/s/ RUDY LOZANO, Judge**
                                   **United States District Court**